IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TERESA BLACKBURN, | ) | |
| ADRIAN MARTINEZ-PEREZ, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | 1:14CV560 |
| | ) | |
| TOWN OF KERNERSVILLE, | ) | |
| OFFICER J. L. REDDEN, | ) | |
| in his individual capacity, OFFICER E. | ) | |
| G. SHUMATE, in his individual capacity, | ) | |
| OFFICER K. L. CULLISON, in his | ) | |
| individual capacity, OFFICER M. W. | ) | |
| LONG, in his individual capacity, | ) | |
| OFFICER R. L. JOYNER, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, alleging violations of the United States Constitution, as well as various state law claims. Before the Court is Defendants' Motion for Summary Judgment (ECF No. 33) based on qualified immunity as to Plaintiffs' federal claims, public official immunity as to their state claims, and Plaintiffs' failure to establish municipality liability. In addition, Plaintiffs have filed a Motion for Additional Discovery (ECF No. 36). For the reasons set forth below, the Court grants in part and denies in part Defendants' motion, and denies Plaintiffs' motion.

**I.    STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When reviewing a motion for summary judgment, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). Where, as in this case, qualified immunity has been raised by the defendants, "this usually means adopting . . . the plaintiff's version of the facts." *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

## II.  FACTS

On May 22, 2014, Plaintiffs, Teresa Blackburn ("Blackburn") and Adrian Martinez-Perez ("Martinez-Perez"), went to Chalarka Tax Office in Kernersville, North Carolina to open two businesses. (ECF No. 11 ¶ 21.) Plaintiffs were accompanied by Leonardo Lopez Garcia ("Garcia"). (*Id.* ¶ 24.) At some point after Plaintiffs arrived at the tax office, the owner, Elizabeth Chalarka ("Chalarka"), placed a call to the Kernersville Police Department ("KPD").[1] (*Id.* ¶ 25.)

In response to the call dispatched as "a man with a gun" at "the 100 block of Main Street" (ECF No. 35-3 at 2:25–3:1), Kernersville police officers R. L. Joyner ("Joyner"), J. L. Redden ("Redden"), E. G. Shumate ("Shumate"), M. W. Long ("Long"), and K. L. Cullison ("Cullison") arrived at the tax office  (*see* ECF No. 11 ¶ 26). Joyner was the first officer to

---

[1] The day before, Officer E.G. Shumate ("Shumate") of the KPD took a report, made in person, by Chalarka regarding a dispute involving herself, her daughter, and her daughter's boyfriend. (*See* ECF No. 35-1 at 2:2–25; 35-2 at 2:15–24.) Shumate recalled Chalarka stating, at the time, that she was fearful for her life. (ECF No. 35-1 at 2:4–8.)

2

respond (ECF No. 35-2 at 4:5–9) and upon arrival approached Garcia who matched the police dispatch's description (ECF No. 35-3 at 3:1–25). Joyner frisked Garcia for weapons and found none. (ECF No. 35-3 at 3:24–25.) While Garcia was being detained, Redden arrived. (*See* ECF No. 37-1 at 11:16–24, 12:10–21, 14:1–6.) Joyner left Redden outside with Garcia and entered the tax office. (ECF No. 35-2 at 5:2–7, 14–22.) Redden performed a second frisk of Garcia during which Martinez-Perez approached, asked Redden the reason for his frisk of Garcia, and told Redden that Garcia was unarmed. (ECF No. 37-1 at 14:13–23, 15:3–20, 16:7–9.) A verbal exchange ensued between Redden and Martinez-Perez in which Redden told Martinez-Perez to "wait his turn." (*Id.* at 15:18–25, 16:1–11.) Martinez-Perez walked away and sat on a nearby windowsill. (ECF No. 35-2 at 9:9–11.)

After Redden completed his frisk of Garcia, he approached Martinez-Perez and told him to stand up. (*Id.* at 10:2–7.) Redden then asked Martinez-Perez if he had any weapons. (*Id.*) Martinez-Perez responded by telling Redden that he was carrying a pocketknife in his pocket for work and, with his hands raised, pointed to his pants pocket. (*See* ECF No. 35-4 at 4:4–9; ECF No. 37-1 at 19:10–20:6; ECF No. 11 ¶ 31.) During Redden's encounter with Martinez-Perez, Shumate arrived on the scene and approached with his gun pointed at Martinez-Perez (*see* ECF No. 35-1 at 3:8–11, 4:13–16; ECF No. 35-4 at 4:4–5). Despite his compliance with Redden's attempted frisk (*see* ECF No. 35-6 at 2:1–11), the officers threw Martinez-Perez to the ground, and Shumate placed his foot on Martinez-Perez's shoulder (*see* ECF No. 35-1 at 5:21–24; ECF No. 37 at 3; ECF No. 37-1 at 20:4–9). While on the ground, Martinez-Perez was kicked by multiple officers and struck in the face by Redden before

3

being arrested, handcuffed, and placed in the backseat of a patrol car. (*See* ECF No. 35-4 at 4:10–13; ECF No. 35-6 at 2:7–13; 37-1 at 23:11–21.)

While handcuffed and under arrest, Martinez-Perez was told by Redden that a $5 dollar bill, found on the ground, had white powder on its face and tested positive for cocaine. (*See* ECF No. 37-3 at 6:7–8, 9:16–23, 10:24–25.) Martinez-Perez adamantly denied ownership of the bill. (ECF No. 37 at 3; ECF No. 37-3 at 10:24–11:1-7.) Officer Long, who had performed the test on the $5 bill, then conducted a canine sniff around the exterior of Blackburn's vehicle. (ECF No. 37-3 at 7:7–8, 13:17–14:1.) Following the canine's alert on the vehicle, Long and Cullison searched the vehicle's interior. (*Id.* at 14:12–15, 16:1–20.) Although no narcotics were found during the officers' search of the vehicle, the officers seized $16,000 found inside the vehicle in Blackburn's purse. (ECF No. 11 ¶¶ 41–42.) Upon hearing that his fellow officers were seizing Blackburn's money, Redden told the officers that Martinez-Perez also had "a large . . . amount of money in his pocket." (ECF No. 35-2 at 20:2–12.) Redden was then directed to seize the $4,000 in Martinez-Perez's pocket. (*Id.* at 20:14–15.) Martinez-Perez was charged with resisting arrest and simple possession of a controlled substance. (ECF No. 11 ¶ 45.) Blackburn was not charged with a crime. (*Id.* ¶ 47.) On June 3, 2014, Plaintiffs initiated this action in state court which was removed to this Court on July 2, 2014. (ECF Nos. 1, 2.)

## III. DISCUSSION

Defendant officers now move for summary judgment based on qualified immunity as to Plaintiffs' federal claims and on public official immunity as to Plaintiffs' state claims.

Defendant Town of Kernersville moves for summary judgment based on Plaintiffs' failure to demonstrate municipality liability.

### A. Plaintiffs' Federal Claims

In evaluating whether Defendants are entitled to qualified immunity, the Court must conduct a two-pronged inquiry: (1) whether, viewed in the light most favorable to the party asserting the injury, the officers' conduct violated a constitutional right; and (2) whether the right in question was "clearly established" at the time of the violation such that it was objectively reasonable that the defendants would have had "fair warning" that their alleged conduct was unconstitutional.[2] *Tolan v. Cotton*, 134 S. Ct. 1861, 1865–66 (2014); *see Saucier v. Katz*, 533 U.S. 194, 200 (2001).

Plaintiffs bear the burden of proving that a constitutional violation has occurred, while the Defendant officers bear the burden of proving that their actions did not violate a clearly established right. *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007).

### 1. Fourth Amendment Claims

### a. Plaintiff Adrian Martinez-Perez

Martinez-Perez argues that his Fourth Amendment rights were violated when: (i) he was subjected to an unlawful seizure by Redden; (ii) he was subjected to a warrantless arrest and search by Redden and Shumate; (iii) his seizure was unlawfully extended for Long to

---

[2] The Court has discretion to address each prong in the order "that will best facilitate the fair and efficient disposition of each case." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)).

conduct a canine sniff of the vehicle; and (iv) his funds were unlawfully seized by Redden. [3] (ECF Nos. 11 ¶¶ 52–63; 37 at 9–11.)  The officers contend that they are entitled to qualified immunity on Martinez-Perez's Fourth Amendment claims because: (i) Plaintiff has failed to establish that constitutional violations occurred; and (ii) even if Plaintiff can establish that constitutional violations occurred, he has failed to show that it would have been apparent to an objectively reasonable officer that his conduct violated Plaintiff's constitutional rights. (ECF No. 35 at 13.)

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The key inquiry under the Fourth Amendment is reasonableness in light of the specific circumstances surrounding the police officers' encounter with the Plaintiffs.  *See Terry v. Ohio*, 392 U.S. 1, 19 (1968).  This is an objective standard which requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Scott*, 550 U.S. at 383 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)); *see Graham v. Connor*, 490 U.S. 386, 396 (1989); *Terry*, 392 U.S. at 20–21.

### (i)     Plaintiff's Seizure by Redden

---

[3] Though Plaintiffs have also asserted an excessive force claim (*see* Memorandum Opinion and Order, ECF No. 21 at 3 n.2), Defendants do not address this claim in the briefing in support of their Motion for Summary Judgment, nor do they request qualified immunity with respect to this claim. As a result, Plaintiff's Fourth Amendment excessive force claim remains an issue to be adjudicated at trial.

6

A seizure under the Fourth Amendment occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry*, 392 U.S. at 16; *see Scott*, 550 U.S. at 381. The Fourth Amendment does, however, allow police officers to conduct brief, investigatory stops based on reasonable suspicion "supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). The reasonable suspicion necessary to justify a stop depends on "both the content of information possessed by police and its degree of reliability." *Alabama v. White,* 496 U.S. 325, 330 (1990).

In determining whether Redden had reasonable suspicion to stop and question Plaintiff, the Court must "assess the relevant facts known to the authorities and decide whether those facts, 'from the standpoint of an objectively reasonable police officer,' give rise to reasonable suspicion." *United States v. Singh*, 363 F.3d 347, 354 (4th Cir. 2004) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Here, the relevant facts began the day prior to the incident when Redden became aware of a police report by Chalarka regarding a dispute between her daughter and her daughter's boyfriend who, as Redden recalled, was "going to come up there (to the tax office) with a gun." (ECF No. 35-2 at 2:15–24.) The following day, in response to the police dispatch of "a man with a gun" (ECF No. 35-3 at 2:25–3:1), Redden arrived at the tax office and found Joyner with Garcia, the man identified in the police dispatch (ECF No. 37-1 at 11:16–21). According to Joyner, when Redden arrived on the scene, he (Joyner) told Redden that Garcia "is the guy – I believe this is the guy that was supposed to have the gun. I didn't see – find anything on him, but you might want to double-check him." (ECF No. 35-3 at 4:1–6.) Joyner also

7

testified that while he was with Garcia, Chalarka confirmed to Joyner that Garcia was the suspect. (*Id.* at 4:7–10.)

During Redden's frisk of Garcia, Plaintiff approached, asked Redden the reason for his frisk of Garcia, and told Redden that Garcia was unarmed. (ECF No. 37-1 at 15:9–20, 16:7–9.) In his deposition, Redden describes his encounter with Plaintiff as follows:

> Mr. Perez starts talking to me to my right. . . . I don't know where he came from. I don't know if he was sitting in the car. I don't know. He just – I just was like who is this guy? . . . [H]e might have a weapon. . . . And since he interjected himself – you know, I was waiting for backup to get there to pat him down next.

(ECF No. 35-2 at 7:6–12; 8:1–5.) Redden told Plaintiff to "wait his turn" and in response, Plaintiff walked over to a nearby location and waited. (*Id.* at 8:11, 9:9–11.)

At the moment that Redden told Plaintiff to "wait his turn," Plaintiff's freedom to walk away was restrained and thus, a seizure of his person had occurred. *See Terry*, 392 U.S. at 16; *see also Scott*, 550 U.S. at 381. In support of their argument that this seizure was justified, Defendants rely, in part, upon Blackburn's deposition testimony in which she states that during Chalarka's call to the KPD, she said, among other things: "[t]hey . . . came right here to kill my daughter, my grandkids, and kill me." "I think they are drug dealers. They have drugs on them." (ECF No. 35 at 11.) Defendants further rely on statements made by Blackburn that, upon the officers' arrival, Chalarka stated "they came with guns . . . [t]hey have weapons". (*Id.*) Defendants argue that these statements, together with the circumstances at the time of incident, "would lead a reasonable person to conclude that there is a fair probability of criminal activity." (*Id.*) Despite Defendants' contention, however, the officers' own testimony does not reflect that Redden or his fellow officers were

aware of these statements. *See United States v. Digiovanni*, 650 F.3d 498, 511 (4th Cir. 2011) (explaining that the court examines "facts within the knowledge of [the officers] to determine the presence or nonexistence of reasonable suspicion").

Based on the totality of the circumstances, including the information known to Redden at the time of the seizure, a reasonable officer would not have concluded that there was reasonable suspicion that Plaintiff was engaged in criminal activity. The police dispatch was concerning "a man with a gun" (ECF No. 35-3 at 2:25–3:1), and the man identified in the dispatch by Chalarka at the scene had been detained and searched by the time Plaintiff approached. According to Redden, when Plaintiff approached him, he did not know who he was or from where he had emerged. Redden offers no basis for his statement that Plaintiff might have a weapon, therefore, such a statement amounts to little more than a hunch.[4] Finally, Redden's assertion that the seizure occurred because Plaintiff "interjected himself" (ECF No. 35-2 at 8:3) falls woefully short of the "articulable facts that criminal activity 'may be afoot'" required to justify such a seizure. *See Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30). Consequently, at the time that Redden restrained Plaintiff, he lacked reasonable suspicion to do so, and Plaintiff's Fourth Amendment right to be free from an unreasonable seizure was violated.

The Court further concludes that Plaintiff's Fourth Amendment right to be free from unreasonable seizure was clearly established such that Redden should have had fair warning that, absent reasonable suspicion of Plaintiff's involvement in criminal activity, his seizure of

---

[4] "An 'inchoate and unparticularized suspicion or "hunch"' is not a permissible basis for a *Terry* stop." *United States v. Hernandez-Mendez*, 626 F.3d 203, 207 (4th Cir. 2010) (quoting *Terry*, 392 U.S. at 27).

9

Plaintiff was unconstitutional. Fourth Amendment jurisprudence has long established the right of an individual to be free from unreasonable seizure, even for a brief period of time, unless there is reasonable suspicion that criminal activity is afoot. *See* U.S. Const. amend. IV; *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Sokolow*, 490 U.S. at 7; *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *Terry*, 392 U.S. at 26, 30–31. A reasonable officer would have been put on notice that seizing Plaintiff under the circumstances was unlawful. The Court concludes that Redden is not entitled to summary judgment based on qualified immunity as to this claim.

### (ii)  Warrantless Arrest and Search

The Fourth Amendment provides that "no [w]arrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Fourth Circuit has explained, however, that warrantless arrests are permitted when there is probable cause for an arrest. *See United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir. 1984). Probable cause exists "when, at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *Id.; see Park v. Shiflett*, 250 F. 3d 843, 850 (4th Cir. 2001). In addition, a "search for weapons in the absence of probable cause to arrest . . . must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." *Terry*, 392 U.S. at 25–26.

Redden and Shumate argue that Plaintiff's attempt to resist Redden's pat down was probable cause to arrest Plaintiff for "obstruction, delay and resisting arrest," and further, Plaintiff was lawfully searched incident to his arrest. (ECF No. 35 at 12.) The officers also argue that, even under Plaintiff's version of events, they are entitled to qualified immunity

because "no reasonable officer would have believed they were violating the Plaintiff's rights by arresting [him]." (ECF No. 35 at 12.)

Here, viewing the facts in the light most favorable to Plaintiff, the facts demonstrate that Plaintiff was compliant during Redden's stop which this Court has concluded was unlawful. By Redden's own testimony, when told to "wait his turn," Plaintiff walked away and sat on a nearby windowsill. (ECF No. 35-2 at 8:10–11, 9:9–11.) When Redden approached Plaintiff and told him to stand, he stood. (*Id.* at 10:5–15.) Then, with Shumate's gun pointed at him, Plaintiff's hands were in the air, and in response to Redden's inquiry about whether he had a weapon, Plaintiff pointed to his pants pocket and told Redden that he was carrying a pocketknife for work. [5] (ECF No. 35-4 at 4:4–9; ECF No. 37-1 at 19:10–20:6; ECF No. 11 ¶¶ 30–31.) Although Plaintiff posed no threat of violence, and did not resist Redden's commands, he was thrown to the ground, struck about his face and body by the officers, and placed under arrest. (*See* ECF No. 35-6 at 2:8–13; ECF No. 37 at 3; ECF 11 ¶ 34.) The Court concludes that Redden and Shumate's arrest of Plaintiff lacked probable cause, thus violating Plaintiff's constitutional rights. The subsequent search of Plaintiff's person, conducted incident to the unlawful arrest, is likewise unconstitutional. *See Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979) (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973) (holding that a search incident to arrest is *only* permitted pursuant to a *lawful* arrest));

---

[5] Redden's account of this exchange differs from Plaintiff's account. Redden contends that in response to his inquiry about whether Martinez-Perez was carrying any weapons, Martinez-Perez "reached in his pocket as he said yes," "stood up [and] bladed off." (ECF No. 35-2 at 10:7–17.) However, as noted earlier, where qualified immunity is asserted, the Court views the evidence in the light most favorable to the non-moving party, and adopts Plaintiff's facts. *Iko*, 535 F.3d at 230.

*see also Henry v. United States*, 361 U.S. 98 (1959) (holding that where the arrest was unlawful, the subsequent search incident to arrest was also unlawful).

The Court must now determine whether the violated right was "clearly established" such that a reasonable officer would have been on notice that his conduct was unconstitutional. It is well established that warrantless arrests are permitted if supported by probable cause that the arrestee has committed, or is committing, a crime at the time of the arrest. *See Maryland v. Pringle*, 540 U.S. 366, 370 (2003); *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004). Further, even if Plaintiff had resisted, "[o]ne has an undoubted right to resist an unlawful arrest." *United States v. Di Re*, 332 U.S. 581, 594 (1948). Thus, Defendants have failed to establish that a reasonable officer would not have known that the arrest and subsequent search, incident to arrest, was unconstitutional. Therefore, Redden and Shumate are not entitled to summary judgment based on qualified immunity as to the arrest and subsequent search of Plaintiff.

### (iii)    <u>Canine Sniff</u>

Generally, a "canine sniff" conducted during a *lawful* stop, does not constitute a search under the Fourth Amendment. *See United States v. Branch*, 537 F.3d 328, 335–36 (4th Cir. 2008); *see also Illinois v. Caballes*, 543 U.S. 405, 408–09 (2005). However, during an *unlawful* stop, use of a canine and any subsequent discovery would be unconstitutional. *See Caballes*, 543 U.S. at 407–08.

Because, as discussed above, the Court finds the initial stop, arrest, and subsequent search incident to arrest to be unlawful, it follows that extending the stop to conduct a canine sniff was likewise unlawful. *See id.*; *see also Rodriguez v. United States*, 135 S. Ct. 1609,

1612 (2015) (holding that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures").

The Court must now consider whether Long, the officer who conducted the canine sniff, would have had fair warning that his actions in doing so were unconstitutional. Long testified that when he arrived on the scene, the Plaintiff was "secured" and he asked Officer Shumate and Redden what they needed. (ECF No. 35-5 at 3:1–3, 14–15.) He was then given the $5 bill, found by Redden, with "a white-powdered substance that needed to be identified." (*Id.* at 3:14–19.) Long then tested the substance on the bill.[6] Following the field test revealing that the substance on the bill was cocaine (ECF No. 37-3 at 8:23–25), and after "get[ting] a positive ID on the fact that they [Plaintiffs] were driving this vehicle in question," Long then deployed his canine to conduct an air sniff around the vehicle (ECF No. 35-5 at 5:9–6:4).

There is no evidence in the record before the Court to suggest that Long knew the details surrounding the unlawful seizure, arrest, and search of Plaintiff. The record reflects that the information Long had at the time included: (i) that his fellow officers had "secured" an individual on the scene to which officers were dispatched; and (ii) that a bill purportedly from that "secured" individual tested positive for cocaine. (ECF No. 35-5 at 3:14–24; ECF No. 37-3 at 8:20–25.) Under these circumstances, a reasonable official would not have clearly understood that conducting a canine sniff would violate Plaintiff's constitutional rights. Accordingly, although extending Plaintiff's stop to conduct a canine sniff was

---

[6] *See United States v. Jacobsen*, 466 U.S. 109, 123 (1984) (finding that a chemical field test "that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy").

unlawful, the Court finds that Long is nonetheless entitled to summary judgment based on qualified immunity as to the canine sniff of Plaintiff's vehicle.

### (iv)  Seizure of Cash

In support of Defendants' position that the seizure of the $4,000 found on Plaintiff was lawful, Defendants assert that possession of a substantial amount of money is "strong evidence that the cash is connected with drug activity." (ECF No. 35 at 10.) While a large amount of currency *may* provide strong evidence of a connection to illegal drug activity, that fact, standing alone is insufficient to establish such a connection. *See United States v. Currency, U.S., $147,900.00*, 450 F. App'x 261, 264 (4th Cir. 2011) (per curiam) (unpublished) (citing *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992)). Nor do the federal forfeiture cases cited by Defendants support their position. Those cases list factors to include drugs and drug paraphernalia found with the large amount of cash; the suspect's past involvement in drug activity; and a lack of work history or reported income to explain the large amount of cash found which, when taken together with the presence of a large quantity of money, support a reasonable inference that the money was connected to drug activity.[7]

Viewing the evidence in the light most favorable to Plaintiff and drawing rational inferences in his favor, we conclude that, at the time of the seizure, there was no evidence to support a connection between Plaintiff's money and illegal drug activity to justify seizure of Plaintiff's money. Plaintiff denied ownership of the $5 bill found on the ground with trace

---

[7] *Currency, U.S., $147,900.00*, 450 F. App'x at 264; *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501–02 (8th Cir. 2004); *United States v. U.S. Currency, in Amount of $150,660.00*, 980 F.2d 1200, 1207 (8th Cir. 1992).

amounts of cocaine. (ECF No. 37 at 3; ECF No. 37-3 at 10:24–11:7.) In addition, the bill was *not* found with the rest of the money seized from Plaintiff's pocket. (*See* ECF No. 37-3 at 6:1–8.) Further, there is no evidence that narcotics were found either on Plaintiff's person or in the searched vehicle. As a result, the Court finds that Redden's seizure of Plaintiff's funds, at the direction of Joyner, was a constitutional violation.

Property, including currency, may be lawfully seized where there is a substantial connection between the currency and illegal drug activity.[8] Accordingly, where, as here, there is no connection between Plaintiff's money and illegal drug activity, a reasonable officer would have had fair warning that seizure of Plaintiff's money would be unlawful. Defendant officers are therefore not entitled to summary judgment based on qualified immunity as to this claim.

### b. Plaintiff Teresa Blackburn

Blackburn argues generally that her Fourth Amendment rights were violated when: (i) the interior of her vehicle and her purse were unlawfully searched by Long and Cullison; and (ii) $16,000 was unlawfully seized from her purse by Long, Cullison, and Joyner. (*See* ECF No. 11 ¶¶ 40, 55; ECF No. 37 at 5.)

### (i)     Warrantless Vehicle Search

A "'positive alert' from a drug detection dog, in and of itself, provides probable cause to search." *Branch*, 537 F. 3d at 340 n.2; *see United States v. Mason*, 628 F.3d 123, 130 (4th Cir. 2010); *United States v. Robinson*, 707 F.2d 811, 815 (4th Cir. 1983). Moreover, during a lawful

---

[8] *See United States v. Thomas*, 913 F.2d 1111, 1114 (4th Cir. 1990) (finding there must be probable cause for believing that the property subject to seizure and forfeiture is substantially connected to criminal activity); *United States v. Kemp*, 690 F.2d 397, 401 (4th Cir. 1982) (noting that 21 U.S.C. § 881 is a seizure statute that authorizes seizure of property used in violation of the drug laws).

automobile search, officers are permitted to search any containers found in the vehicle which may contain the object of the search. *See Wyoming v. Houghton*, 526 U.S. 295, 307 (1999) (holding that officers with probable cause to search a vehicle may also search a passenger's belongings found inside the vehicle that are capable of concealing the object of the search); *California v. Acevedo*, 500 U.S. 565, 580 (1991) (holding that officers may search a vehicle and the containers within it where they have probable cause to believe contraband or evidence is contained).

In this case, Long and Cullison conducted a hand search of the interior of Plaintiff's vehicle following the drug detection canine's alert during the free-air sniff. (ECF No. 11 ¶ 40; ECF No. 37-3 at 14:12–15, 16:1–20.) The Court finds that, under these circumstances, where the canine gave a positive alert during its sniff of the vehicle's exterior, the officers' search of the vehicle and Blackburn's purse found therein did not constitute a Fourth Amendment violation. Long and Cullison are therefore entitled to summary judgment based on qualified immunity as to Plaintiff's claim regarding the vehicle search.

### (ii)     Seizure of Cash

With respect to the officers' seizure of Blackburn's money, although the officers argue that "[t]he cash was seized as potentially related to drug activity," they have failed to establish any such connection. (ECF No. 35 at 12.) The connection, or lack thereof, between Blackburn's money and potential drug activity is even more tenuous than that of Martinez-Perez as discussed above. The officers have failed to put forth any evidence whatsoever that Blackburn may have been involved in criminal activity to justify seizure of her funds. No assertion has been made by the officers that Blackburn had any connection

to the found $5 bill which tested positive for trace amounts of cocaine. Nor were any narcotics found during the search of Plaintiff's vehicle. (ECF No. 11 ¶ 41; ECF No. 35-5 at 9:16–18.) In fact, during Cullison's deposition, the following exchange took place regarding Blackburn's potential involvement in drug activity:

> Q.    But you had no suspicion that the female that you spoke with
>        had committed any kind of drug crime?
>
> A.     At that point I didn't have anything to say that she did, no.

(ECF No. 37-5 at 21:7–11.)

Under these circumstances, a reasonable officer would have been on notice that the seizure of Blackburn's money was unconstitutional. For these reasons, the Court finds that Long, Cullison, and Joyner are not entitled to summary judgment based on qualified immunity as to Blackburn's claim of unlawful seizure in violation of her Fourth Amendment rights.

### 2. Fifth Amendment Claims

The Fifth Amendment provides, in part, that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Here, in response to Plaintiffs' claim that their funds were unlawfully seized without due process of law, Defendants argue that Plaintiffs' money was seized pursuant to federal forfeiture law, and based on probable cause that the money was connected to illegal drug activity. (ECF No. 35 at 15–16 (citing 21 U.S.C. § 881(a)(6)).)

The officers' own testimony, however, belie their argument. In particular, although Cullison, who along with Long seized the money from Blackburn's purse, testified that "[t]here are federal laws that allow for us to [seize cash] . . . over $10,000" (ECF No. 35-7 at

2:1–4), he also testified prior to their seizure, he had no suspicion that Blackburn had committed any kind of drug crime (ECF No. 37-5 at 21:7–11). Additionally, during a state court Preliminary Injunction hearing on the legality of this seizure of Plaintiffs' funds, Redden, who seized the money from Martinez-Perez's pocket, "testified very candidly that he had no evidence that the Plaintiff Martinez-Perez was involved in any possession with intent to sell or deliver, nor any reason to believe that the cash found on either of the plaintiffs was in any way used in any drug transaction." (ECF No. 37-5 at 39–40 ¶ 7.) Redden also testified in that hearing "that he did not know of any legal reason to seize the currency." (*Id.* at 40 ¶ 9.) Further, when Long was asked during his deposition whether Blackburn's explanations about the money in her purse caused him to suspect drug activity, he testified, "I won't say it's drugs, but I won't say it's legit, either." (ECF No. 37-5 at 29:7–9.)

The officers' testimony also reveal that, at best, they had conflicting and unclear reasons for the seizure of Plaintiffs' money. Cullison testified that Plaintiffs' money was seized because there is a "general practice to keep large sums of money for safekeeping . . . so that person doesn't become a victim of a crime should . . . a criminal learn that she had a large sum of money on [Plaintiff], so we would safe-keep it." (ECF No. 37-5 at 21:15–19.) He continued to explain that the money was seized until Plaintiffs "could provide documentation of where [sic] that money was for or where it came from." (*Id.* at 21:20–24.) Redden also admitted his own confusion over the reason for the seizure, testifying in his deposition that the money was seized "because of drugs, or because they didn't have receipts. I really didn't know." (ECF No. 35-2 at 21:15–18.)

As outlined, Defendants' own evidence demonstrates that the officers did not have probable cause to seize Plaintiffs' funds pursuant to the federal forfeiture statute which requires seized funds to be substantially connected to illegal drug activity. The Court concludes that the officers' seizure was unconstitutional in that it deprived Plaintiffs of their property without due process of law. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 52 (1993) (finding that where the Government seizes property, "not to preserve evidence of wrongdoing, but to assert ownership and control over the property," its action must comply with due process). Moreover, a reasonable officer would have had fair warning that such a seizure, under these circumstances, would deprive Plaintiffs of due process. *See id.* Defendant officers are therefore not entitled to summary judgment based on qualified immunity as to Plaintiffs' Fifth Amendment rights.

### 3. Fourteenth Amendment Claims

The equal protection clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. Where, as here, the claim at issue is one involving racial classifications, strict scrutiny is the proper standard of review. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995) (holding that "all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized"). Under this standard, "such [racial] classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Williams v. Hansen*, 326 F.3d 569, 575–6 (4th Cir. 2003) (quoting *Adarand Constructors, Inc.*, 515 U.S. at 227).

Plaintiffs argue that because of their Hispanic ethnicity, they "were not treated in the same manner as other similarly situated individuals with regard to the seizure of private property," and thus, Defendants violated their Fourteenth Amendment rights. (ECF No. 11 ¶ 68d.) Defendants argue that Plaintiffs' equal protection claim should fail because "Plaintiffs have failed to produce any evidence that Hispanic subjects are treated any differently than those similarly situated or that officers intentionally or purposefully treat them any differently based on their race, ethnicity or national origin." (ECF No. 35 at 16.) The Court agrees with Defendants.

As explained by the Fourth Circuit:

> [To] succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.

*Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Here, even viewed in the light most favorable to Plaintiffs, the record reflects scant evidence in support of Plaintiffs' claim of unequal treatment based on race. Plaintiffs' evidence in this regard includes: (1) their assertion that Defendant Town of Kernersville's ("Town") policy of seizing money from individuals ("inordinately, from Hispanic individuals") without just cause led to violations of Plaintiffs' rights by the KPD officers (ECF No. 11 ¶ 69); (2) testimony from Officer Long that approximately 50 percent of his encounters with subjects are Hispanic, including

"voluntary encounters"[9] and stops (ECF No. 37-5 at 29:10–30:16); and (3) a "U.S. Census Bureau" printout showing the racial make-up of Kernersville, NC, of which 9.7% of the town's population are comprised of Hispanics (ECF No. 37-5 at 31). Plaintiffs accurately point out that they are members of a "protected class" but they fail to show how this racial classification subjects them to discriminatory treatment, different from that of other similarly situated individuals.

Due to Plaintiffs' failure to carry its burden on this claim, the Court is unable to conclude that Defendants violated Plaintiffs' constitutional right of equal protection under the Fourteenth Amendment and, as such, Defendants are entitled to qualified immunity on this claim.

### B. Plaintiffs' State Law Claims[10]

Defendants contend that they are entitled to public official immunity as to Plaintiffs' state law causes of action. Plaintiffs' contend that because the "malicious and corrupt" actions of the officers exceeded the scope of their duties and discretion, Defendants are not entitled to summary judgment based on public official immunity as to the state law claims.

Under North Carolina law, public official immunity grants police officers "engaged in the performance of governmental duties involving the exercise of judgment and discretion"

---

[9] Plaintiffs characterize Officer Long's interaction with Hispanics as "extremely disproportionate" and "racially motivated" but, beyond conjecture, Plaintiffs provide no supporting evidence. (ECF No. 37 at 14.)

[10] Pursuant to 28 U.S.C. § 1367(a), in cases involving a federal question, as in this case, "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). This Court is obligated to apply North Carolina substantive law to Plaintiffs' state law claims. *See Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416 n.7 (4th Cir. 1992); *see also United Mineworkers of Am. v. Gibbs*, 383 U.S. 715, 725–26 (a federal court is "bound to apply state law" to pendent state law claims).

immunity from personal liability in their individual capacity, unless the officer's conduct is proven to be "corrupt or malicious" or "outside of and beyond the scope of his duties." *Meyer v. Walls*, 347 N.C. 97, 112, 489 S.E.2d 880, 888 (1997) (quoting *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952)); *see Thomas v. Sellers*, 142 N.C. App. 310, 313, 542 S.E.2d 283, 286 (2001). "An officer acts with malice when he 'does that which [an officer] of reasonable intelligence would know to be contrary to his duty,' i.e., when he violates a clearly established right." *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013) (quoting *Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003)); *see Grad v. Kaasa*, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984).

### 1. State Constitution Claims

Sections 1 and 19 of the North Carolina Constitution provide for due process and equal protection of all persons under the law. As noted by the parties, "North Carolina courts have consistently interpreted the due process and equal protection clauses of the North Carolina Constitution as synonymous" with their federal constitutional counterparts. *Tri-Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 435 n.6 (4th Cir. 2002). *See e.g.*, *Munn-Goins v. Bd. of Trs. of Bladen Cmty. Coll.*, 658 F. Supp. 2d 713, 731 (E.D.N.C. 2009) (finding that North Carolina courts interpret due process under the federal constitution's Fourteenth Amendment and § 19 of the state constitution in similar fashion); *Shavitz v. City of High Point*, 270 F. Supp. 2d 702, 722 (M.D.N.C. 2003) (holding that North Carolina's Equal Protection Clause is "functionally equivalent" to the Equal Protection Clause of the U.S. Constitution's Fourteenth Amendment).

Accordingly, for the reasons stated above regarding Plaintiffs' federal equal protection claim, this Court finds that Plaintiffs have not established that the officers violated Plaintiffs' equal protection rights under the North Carolina Constitution. Defendant officers are therefore entitled to public official immunity on Plaintiffs' state law equal protection claim. Further, given the Court's above finding that Plaintiffs' federal due process claim shall proceed, the corresponding state law due process claim shall likewise move forward. *See Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (finding that state law claim was "subsumed" within federal claim therefore state law claim should likewise proceed).

### 2. Conversion

Under North Carolina law, "conversion" is the "unauthorized assumption and exercise of the right of ownership" over the goods or personal chattels of another, to the exclusion of the owner's rights. *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956). In this case, Plaintiffs contend that "without authorization," Defendants "assumed and exercised the right of ownership" over Plaintiffs' property, and are therefore liable for conversion. (ECF No. 11 ¶ 88.) The officers, however, argue that they are shielded by public official immunity in that there is no evidence of malicious or corrupt conduct by the officers. (ECF. No. 35 at 21–22.)

The merits of Plaintiffs' conversion claim are tied to the reasonableness of Defendant officers' actions in seizing Plaintiffs' funds. *See Cooper*, 735 F.3d at 160 (affirming district court's finding that plaintiff's state law claims against defendant officers were tied to the reasonableness of the officers' conduct). As previously noted in this Court's discussion of

the officers' seizure of Plaintiffs' funds, the officers' conduct in this regard was not objectively reasonable, given the totality of circumstances, and constituted a violation of Plaintiffs' rights. Accordingly, the officers are not entitled to public official immunity as to Plaintiffs' claim of conversion.

### 3. Intentional Infliction of Emotional Distress

Blackburn contends that she witnessed the officers' interaction with her husband, Martinez-Perez, during his detention, search, and arrest, and that interaction was so unreasonable that it "caused her to suffer extreme emotion [sic] distress and suffer physically from the illegal encounter." (ECF No. 11 ¶ 100.)

In North Carolina, there are three elements to a claim for intentional infliction of emotional distress: (1) extreme and outrageous conduct by defendants (2) which is intended to and does in fact cause (3) severe emotional distress. *Holloway v. Wachovia Bank & Tr. Co.*, 339 N.C. 338, 351, 452 S.E.2d 233, 240 (1994); *Foster v. Crandell*, 181 N.C. App. 152, 168, 638 S.E.2d 526, 537 (2007). "Extreme and outrageous conduct" is proven by conduct which is so outrageous and extreme "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Foster*, 181 N.C. App. at 168, 638 S.E.2d at 537 (quoting *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 373, 618 S.E.2d 867, 872 (2005)). Determining whether one's actions constitute "extreme and outrageous conduct" is a question of law. *Id.*

Defendant officers argue generally that they "have public official immunity for all state law claims." (ECF No. 35 at 22.) In North Carolina, "[p]ublic official immunity is not a defense to intentional torts." *Bradley v. Ramsey*, 329 F. Supp. 2d 617, 626 (W.D.N.C. 2004)

(quoting *Mandsager v. Univ. of N.C. at Greensboro*, 269 F. Supp. 2d 662, 681 (M.D.N.C. 2003));

*see Wells v. N.C. Dep't of Corr.*, 152 N.C. App. 307, 320, 567 S.E.2d 803, 813 (2002) (noting

that if plaintiff "alleges an intentional tort claim . . . neither a public official nor a public

employee is immunized from suit in his individual capacity"); *Hawkins v. State*, 117 N.C. App.

615, 630, 453 S.E.2d 233, 242 (1995) ("Because malice encompasses intent, we conclude that

if a party alleges an intentional tort claim, the doctrine of qualified immunity does not

immunize public officials . . . from suit in their individual capacities.").[11]

Blackburn's state law claim of intentional infliction of emotional distress is an

intentional tort. Thus, as to this claim, Defendants are not entitled to summary judgment

based on public official immunity.

### 4. Slander *Per Se*

Under North Carolina law, slander *per se* is defined as a false oral communication to a

third party "that amounts to: (1) an accusation that the plaintiff committed a crime involving

moral turpitude, (2) an allegation that impeaches the plaintiff in his trade, business, or

profession, or (3) an imputation that the plaintiff has a loathsome disease." *Eli Research, Inc.*

*v. United Commc'ns Grp., LLC*, 312 F. Supp. 2d 748, 761 (M.D.N.C. 2004); *Boyce & Isley v.*

*Cooper*, 153 N.C. App. 25, 29–30, 568 S.E.2d 893, 898 (2002). In North Carolina, a claim of

defamation must include a "recount [of] the allegedly defamatory statement either verbatim

or at least with enough specificity to allow the Court to decide if the statement is

---

[11] *But see Maney v. Fealy*, 69 F. Supp. 3d 553, 564–65 (M.D.N.C. 2014) (acknowledging the split in
North Carolina courts over whether public official immunity is a defense to all intentional torts and
finding that public official immunity may be applied to the intentional tort of battery which does not
necessarily encompass malice).

defamatory." *Jolly v. Acad. Collection Serv., Inc.*, 400 F. Supp. 2d 851, 861 (M.D.N.C. 2005) (citing *Morrow v. Kings Dep't Stores, Inc.*, 57 N.C. App. 13, 21, 290 S.E.2d 732, 737 (1982)).

Here, Plaintiffs contend generally that the Defendant officers' spoken statements, "made in the presence of the others[,] . . . involved accusations that Plaintiffs committed a crime or offense of moral turpitude, or were . . . subject to detention, search, seizure and the illegal taking of property." (ECF No. 11 ¶¶ 112–13.) Plaintiffs also contend that these statements were "defamatory with respect to their trade, business or profession . . . and were repeated with reckless disregard for the truth." (*Id.* ¶¶ 114–15.) Plaintiffs have not, however, identified the precise statements made by the officers which form the basis for this claim; nor do Plaintiffs identify any third party to whom the alleged defamatory statements were made. Consequently Defendants are entitled to summary judgment based on public official immunity as to Plaintiffs' claim of slander *per se*.

### C. Municipality Liability

As a general rule, an action for liability against a municipality under 42 U.S.C. § 1983 only exists when its official policy or custom causes a deprivation of an individual's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

Evidence of a municipality's official policy or custom "may be found in written ordinances and regulations, in certain affirmative decisions of individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008) (quoting *Carter*, 164 F. 3d at 218); *see Bd. of Cty. Comm'rs of Bryan Cty. v.*

*Brown*, 520 U.S. 397, 404 (1996) (noting that an action against a municipality will not lie where plaintiff "merely . . . identif[ies] conduct properly attributable to the municipality [rather] plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the moving force behind the injury alleged"). Additionally, a municipality may be liable under § 1983 when, despite the absence of a formal policy, there is a "persistent and widespread" discriminatory practice that is so "well settled as to constitute a 'custom or usage' with the force of law." *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691).

Specifically, this Court has articulated that the appropriate test for establishing municipality liability under § 1983 requires Plaintiffs to show that: "(1) an unconstitutional custom or practice was so common as to have the force of law, (2) the responsible policy makers were actually or constructively aware of its existence, (3) they failed through specific intent or deliberate indifference to stop the practice, and (4) a sufficiently close causal link exists between the unconstitutional practice and the violation of plaintiffs' rights." *Massasoit v. Carter*, 439 F. Supp. 2d 463, 481 (M.D.N.C. 2006); *see Spell v. McDaniel*, 824 F.2d 1380, 1390–91 (4th Cir. 1987).

In *Spell v. McDaniel*, where a municipality was found liable, plaintiffs provided testimonial evidence as well as police department records which graphically depicted frequent instances of police brutality within the department, and which further proved that the named Defendants were responsible for "establishing, enforcing, directing, supervising and controlling policies, customs, practices, usages, and procedures" used by police officials in carrying out violent acts of brutality. 824 F.2d at 1392–95. Moreover, even in *Massasoit v. Carter*, where the Court found that Plaintiffs' evidence "falls far short of what is necessary"

27

to prove municipality liability, the Plaintiffs there provided more evidence[12] (of the alleged pattern or practice of police officers' use of excessive force) than has been provided by the Plaintiffs in the case at bar. 439 F. Supp. 2d at 481.

Here again, Plaintiffs' evidence in support of this claim includes: (1) their assertion that Defendant Town's policy of seizing money from individuals ("inordinately, from Hispanic individuals") without just cause led to violations of Plaintiffs' rights by the KPD officers. (ECF No. 11 ¶¶ 56, 69, 82, 89, 99, 117); (2) testimony from Officer Long that approximately 50 percent of his encounters with subjects are Hispanic, including "voluntary encounters"[13] and stops (ECF No. 37-5 at 29:10–25, 30:1–16); and (3) a "U.S. Census Bureau" printout showing the racial make-up of Kernersville, NC, of which 9.7% of the town's population are comprised of Hispanics (ECF No. 37-5 at 31).

Plaintiffs do not allege that any of the named defendants hold a decision-making role and are responsible for enacting seizure policies or customs which disproportionately affect Hispanics. Nor do Plaintiffs provide any incident reports, lawsuits against the Town or the KPD, or other evidence to support its allegations of discriminatory seizure policies targeting Hispanics. Most telling, however, is Plaintiffs' own admission in their Response Brief that they are "seeking to perform additional discovery that [they] believe will show a practice and

---

[12] The plaintiffs in *Massasoit* provided reports of four incidents of excessive force, two lawsuits filed against the police department, and documented lapses in the department's paperwork procedures. 439 F. Supp. 2d at 481.

[13] Plaintiffs characterize Officer Long's interaction with Hispanics as "extremely disproportionate" and "racially motivated" but, beyond conjecture, Plaintiffs provide no supporting evidence. (*See* ECF No. 37 at 14.)

custom of discriminatory policing and illegal seizures."[14]  (ECF No. 37 at 18.)  Plaintiffs have effectively conceded their failure to produce sufficient evidence of a discriminatory policy or custom which is causally linked to Plaintiffs' injuries to establish municipality liability under § 1983.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims against the Town of Kernersville which is dismissed from this action.

## IV.    MOTION FOR ADDITIONAL DISCOVERY

Plaintiffs have filed a Motion for Additional Discovery[15] seeking "to serve additional discovery on Defendants."   (ECF No. 36 at 1.)   Plaintiffs contend that Defendants' responses to Plaintiffs' second set of interrogatories about past seizures and forfeitures were insufficient; accordingly, Plaintiffs now "seek to serve discovery to further understand the reasons behind the seizure and the history, demographics, training, etc. behind the practice." (*Id.* ¶ 2.)  In its opposition to Plaintiffs' motion, Defendants argue, in part, that "Plaintiffs have had ample opportunity within the Scheduling Order discovery timeline to obtain the responses that they now seek."  (ECF No. 39 at 2.)  Defendants also assert that "Plaintiffs have waited an unreasonable length of time before seeking" the court's assistance.  (*Id.* at 5.)

---

[14] Plaintiffs have filed a Motion for Additional Discovery, which this Court addresses below (*see* Section IV).

[15] To the extent that Plaintiffs seek additional discovery pursuant to Federal Rule of Civil Procedure 56(d), they have failed to satisfy the requirements of the Rule which specify that a non-movant must file an "affidavit or declaration [showing] that, for specified reasons, it cannot properly oppose a motion to justify its opposition".  Fed. R. Civ. P. 56(d).  Plaintiffs have not filed any such affidavit or declaration.  *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) ("If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a [Rule 56(d)] affidavit stating 'that it could not properly oppose a motion for summary judgment without a chance to conduct discovery.'" (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996))).  Additionally, Plaintiffs' motion fails to comply with the requirements of Local Rule 7.3 in that it is not accompanied by a supporting brief, nor does it cite any statute or rule of procedure relied upon in seeking the requested relief.

29

District courts have substantial discretion in managing discovery, and the violation of scheduling orders may lead to the exclusion of evidence or a dismissal of claims. *See United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002), *cert. denied*, 538 U.S. 1012 (2003); *Rabb v. Amatex Corp.*, 769 F.2d 996, 999–1000 (4th Cir. 1985). Moreover, this Court has held that "[a] reasonable discovery schedule may be enforced, even if relevant discovery is denied, unless extenuating circumstances compel a contrary finding." *Parkway Gallery Furniture, Inc. v. Kittinger/Pa. House Grp., Inc.*, 116 F.R.D. 363, 365 (M.D.N.C. 1987).

In this case, the Court entered a Scheduling Order[16] on December 31, 2014 adopting the parties' Joint Rule 26(f) Report (ECF No. 24) which included a seven (7) month discovery period, up to and including July 31, 2015. (ECF No. 25.) Plaintiffs served their first and second set of discovery requests on February 2, 2015 and February 9, 2015, respectively. (ECF Nos. 39-1, 39-2.) Defendants' responses to Plaintiffs' first and second set of discovery were served on May 5, 2015. (ECF No. 39-3.) Plaintiffs filed the instant Motion for Additional Discovery on September 8, 2015 – 39 days after the close of discovery in this case, and 126 days after service of Defendants' discovery responses. In so doing, Plaintiffs offer no explanation as to the reason they failed to seek additional discovery upon receipt of Defendants' responses. Plaintiffs also offer no explanation as to the reason they failed to seek an extension of the discovery period before the July 31, 2015 deadline. Plaintiffs had the opportunity, prior to the end of the discovery period, to request complete

---

[16] To the extent Plaintiffs' motion seeks modification of the Scheduling Order to permit the requested discovery, Plaintiffs must demonstrate that good cause exists to do so. Fed. R. Civ. P. 16(4). Plaintiffs' motion, however, makes no showing as to why good cause exists to permit additional discovery beyond the close of the discovery period.

responses from Defendants, and to file a motion to compel, if they deemed it necessary to do so. Instead, Plaintiffs elected to wait until well after the close of discovery, and during the briefing of the pending dispositive motion, to file its Motion for Additional Discovery.

In light of the above, and given Plaintiffs' failure to offer an explanation of what, if any, extenuating circumstances exist to support this request, the Court denies Plaintiffs' Motion for Additional Discovery.

For the reasons outlined herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (ECF No. 34) is GRANTED IN PART and DENIED IN PART. Defendants' Motion for Summary Judgment is GRANTED as to: (1) Plaintiffs' claims of unlawful vehicle search and canine sniff under the Fourth Amendment to the United States Constitution; (2) Plaintiffs' equal protection claims under the Fourteenth Amendment of the United States Constitution; (3) Plaintiffs' equal protection claims under § 19 of the North Carolina Constitution; (4) Plaintiffs' claims of slander *per se*; and (5) Plaintiffs' claims against the Town of Kernersville which is hereby dismissed from this action. Defendants' Motion for Summary Judgment is DENIED as to all of Plaintiffs' remaining claims.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Additional Discovery (ECF No. 36) is DENIED.

This, the 25th day of February, 2016.


_____/s/ Loretta C. Biggs_____
United States District Judge